Good morning, Your Honors, and opposing counsel, Mr. Adams. It's always a pleasure to be in your courtroom. I am Carolyn Chapman, and I represent the petitioner, Suze Warren. And with me today, Ms. Warren is at the table, at the counsel table, and my son, who is a second-year law student, has also been with this case about 10 years, along with me. In July of 1998, Ms. Warren found herself on the Chi-Yung, which was headed to Mexico. It was interdicted by the U.S. Coast Guard in August of 1998, and in September of 1998, the boat was brought to San Diego, and the swan was paroled into the United States. Ultimately, she was released from the MCC, and she spent some time in detention. Overall, in these 10 years, she has spent two years in detention, fearful to go back to China. I would like to – I want to address the issue of the credibility finding and the due process issues that I see in this case. Petitioner's claim for asylum is based on the fact that she was unmarried and pregnant, and as a result of the public – People's Republic of China had been forced to undergo a forced abortion. The immigration judge and the BIA did not believe her testimony. What I'm asking this Court to do is to find that Ms. Warren's testimony is credible, that she was subjected to the forced abortion, and remand this case to the BIA for consideration and investigation in light of the finding. And I had Gao v. Ashcroft, but opposing counsel just handed me a new case, the Soto case, which would mean that even if you find that her credibility – that she was credible, that the BIA does not have to apparently accept that finding. And we know that asylum is discretionary. But I would ask you to find, when I finish with the points I'm going to make to you, that her testimony was credible. Also, I would ask you to set aside her order of deportation so that the IMS will adjudicate her I-485 adjustment of status. She's been married to a David Lamb, a U.S. citizen, for the last seven years. And the IMS will not process her I-485 because of the deportation order, and I haven't been able to find a way around that order except to come through all these proceedings. I would also ask you to conclude that the IJA and the BIA did not have substantial evidence to find that Ms. Warren's testimony lacked credibility. And I would ask that you conclude that she's not entitled to asylum, that she is at the minimum entitled to protection under withholding or cast. There are two of the adverse credibility findings that would be helpful to me to hear your views on. The first thing, the inconsistency identified by the IJA between testimony about her how she was taken from the train or bus stop without any, you know, without being beaten or hit or pushed or shoved or whatever, and then changed to a couple of weeks later to having been pushed and shoved and whatever. The other being the false documents. And particularly in that respect, it looks to me as if the only objection that was made to the IJA was to the one statement by the forensic expert having to do with how the, well, the speculative statement in the middle of his opinion, and the IJA struck that, which still left the opinion standing that the documents showing the find were phonied up. But I'll take responsibility for that. I certainly thought that without the appellate work that I knew that I had to move to strike the whole thing. I thought I did it. When I read the record, I didn't see it on there. But this has been quite a case. Let me address the train versus bus. It's not the train versus the bus that's the major inconsistency. It's how she was taken to the car. On the one hand, she said she was just taken. On the other hand, she said it was she was pushed and shoved and maybe hit, whatever. Okay. Well, let me go through what I have. On the reporter's transcript 172 lines 8 through 25, she testified she went back to Zuzau. She was going to take the train back to Zuzau, which is the village. And then some people came and asked her for her pregnancy certification in the train station in Zuzau. So she was in the train station there. 173 line 15, when she did not have the documents, they took her to a car. And she says, in a vehicle. And the judge said, in a vehicle. And we had trouble with translators. Several of the translators we asked not to come back because they were so poor. And Sally Willam was an attorney. And she speaks Mandarin. She happened to be in the courtroom several times. So part of the problems, I think, were with the translators. Line 16, the second night after the injection, the baby was born. They took her back to her home on a tractor. And it appears from reading the transcript that the home was another hour from the train station. And that normally she would take the bus. She'd go from the city from Juan to Zuzau on the train and then the bus to her home for another hour or so. On line 28, 3 through 12, she went back to see her mother. The birth control people detained her at a train station. Line 279, 5, I was taking a train from Juan to Zuzau. It takes four hours by bus. Line 8, I took train and then switched from train station to take the bus. It takes another hour by bus to get to her home. Two buses a day run between a.m. and p.m. And page 280, line 1, when I was waiting for the bus. And the word in Chinese also means bus or train station. It's an interchangeable word, I discovered. She says, I was arrested by the B.C. people, put into a car, and taken to the hospital in Zuzau City. I hope that answers your question.  Okay, thank you. And then as far as the issue of the documents, in the country reports, it says that a lot of these documents themselves are actually counterfeit. And documents imposing penalties for family planning can be issued only by the family planning units. Therefore, documents issued by work units are fraudulent.  And according to the 1995 country reports, there's no simple way to tell the differences. So for all we know, that she could have been given fraudulent, fine documents. My question is a little more pointed. Okay. And that is that before the I.J., there was an objection made to that part of the experts, the forensic experts' report, where he speculated that it was extremely unlikely that an individual would receive consecutive notices a month apart. And the objection was to that line as being without foundation. And the I.J. struck it. But that leaves standing the forensic experts' conclusion that the documents were not genuine. I think the language actually is that they could be counterfeit. There was no real testimony that they absolutely were counterfeit. Is that necessary? Can't an expert testify as to what is more likely than not? Well, the problem was the expert didn't testify. The district counsel did not produce the expert. Was there a hearsay objection? There wasn't any request to have the expert made available for cross-examination either. Not on the record. We had discussions. You can imagine I was not happy. And I was surprised to find what was not on the record. But in my notes, I had strongly objected to all of this. And the fact that Ms. Todd-Hunter translated the asylum application, then translated documents for the district counsel, there is an issue of that. I feel strongly about attorney-client privilege. Let me address the issue that the immigration judge said that Ms. Warren Well, first of all, the dates of the marriage is 23 for female, 22 for male. Let's see. She kept saying 23 and 25. The county reports that we've made, it says 20 and 22. But there's also another sentence that both the IJA and the BIA failed to discuss. And the sentence in the report, in the county reports or the country reports, says that the age differences vary from region to region. And so in Ms. Warren's mind, and she talked to her sister, she had to be 23 to have a child. So she always stayed in mind that this is what she had to do. So I don't think that that was a valid point. Also, let me go quickly on the balance of your time. Yes. 30 seconds left.  Mr. Evans. Evans. Good morning. I'm Manning Evans. I represent the government in this matter. Could you speak a little louder, please? Yes, Your Honor. I'll try. The agency here made two dispositive findings. Petitioner was not credible regarding her forced abortion claim, and she failed to carry her burden of proof regarding her Convention of Torture, Convention Against Torture claim, which arose out of the alien smuggling. I want to ask you first about the counterfeit document question. And specifically at page 420 of the record, which is page 260 of the transcript, a document, the document, is handed to the petitioner, and the objection is, and for the record I made an objection to that opinion based on lack of foundation expertise. It sounds as if, from that, that the objection is to the document as a whole. Why is that an incorrect understanding of that particular objection? Your Honor, if I can refer the Court to page, this is page 1072 of the record, and this is the actual forensic report. And at page 1072, you'll see a bracketed portion. That's an objection. Exactly, where the immigration judge has indicated exactly what's been objected to. And I don't think that this reference in the transcript is anything more than a shorthand to that specific objection. Well, there's a somewhat lengthy discussion about the specific objection that was made on page, well, it starts with 102, but the discussion is on 103, 104 to 105. And it at least as I read those pages indicates that the objection is to the bracketed statement. That's my understanding, Your Honor. And really, I think that the focus during the debate in the courtroom was on that particular sentence and whether or not the forensic expert could draw a conclusion about the vast number of Chinese citizens that the Population Control Office may be dealing with. And there was no reason to think that the forensic examiner had any expertise in that area. And it's a reasonable conclusion, I think, to draw that conclusion, but that's something for the immigration judge to do. And I think that essentially she did that. And I think that was a reasonable inference to draw. I have another question which is not strictly related to what's in the record, and you may or may not be in a position to answer it. But we in the past few years have seen some cases in which there is a pending request for adjustment of status that the government has been willing to participate in mediation to try to find a solution that is appropriate to all where you're dealing with a person who is not a criminal or some of the other bad things that we see sometimes. Is that something that has been considered in this case? Having looked into this quickly just coming out of the case last week, I understand that my colleague, Ms. Drucker, has spoken with those in counsel about that. But at this point, the government's position is that this case should move forward and the panel should decide it. I was informed last week by a person in counsel that the adjustment application was denied. I believe that there are avenues that could be pursued to further have that reviewed, either through a district court action or a separate appeal from the USCIS determination. But there's been no issue raised in this case. There's nothing in the briefs that challenges the board's decision at page 70 of the record denying the motion to reopen for adjustment. And that motion was reasonably denied, I would add, as there was no supporting documents offered with the motion. If I may mention that the question about whether or not the documents were fraudulent focuses on whether or not the two pieces of paper came from the same document came from the same piece of paper, essentially. And that's what the forensic examiner was focusing on. And he reasonably concluded, after detailed analysis showing several points where it appeared that the two pieces of paper actually had been joined at one time, that scientific examination of the documents was what the forensic examiner was doing. And I think it's a reasonable conclusion. There was certainly no reason to question that. I don't believe it was questioned during the proceedings that, in fact, these two documents were part of the same piece of paper at one point. Regarding the inconsistencies concerning whether or not the Petitioner was mistreated at the time that she was taken by the birth control officials, the board referred to a couple of pages in the record. Those are pages 387 and 440 to 42. And these pages show not only inconsistencies regarding train and bus, but also whether or not the Petitioner claimed that she had been abused at that time. I'd also point to the court at pages 331 of the record, 439, and 1302. Those are all additional pages that are relevant to showing the fact that the Petitioner was not consistent in her assertion that she was mistreated at that time. And that's an important omission, because whether or not the Petitioner had an abortion is not really the question. The question is whether or not it was a forced abortion. And if it wasn't, then there's no claim here. So to be embellishing on that specific point is really a key aspect of her claim and a key aspect of the adverse credibility finding. Sotomayor. I may have a slightly different reading of the record than you do, but it seems to me that the Petitioner did not ever testify affirmatively that she had not been pushed, shoved, beaten, or harmed. There was an omission to mention it, which is a little bit different. Is that a correct reading, that one time she didn't mention it and another time she did rather than saying absolutely not and then absolutely yes? No. I hope I used the word omission on that, too. Well, but then here's the crux of my concern about your argument on that point. It seems to me that the question had not been asked specifically at the time when Petitioner testified without mentioning it. She was not asked specifically, well, did you resist or were you pushed or were you mistreated or whatever? She didn't mention it, but she also wasn't asked. And whenever she was asked, she said that she was. So and the other concern that I have is whether she was given the opportunity to explain that perceived inconsistency that our case law requires. I did not see that in the record either. I can only say that Petitioner has raised that issue before the Court. I have to agree that she wasn't asked specifically about that omission. But I believe that that issue has been waived by not presenting it in the brief. I would also point out to the Court that in the declaration accompanying the amended asylum application, I believe that's at page 1302 of the record, that's her declaration. And I believe that there also she omits any mention of being mistreated at that time. I think that's a significant omission, because she's at that point trying to lay out the basis of her claim, and she should be trying to show that the abortion was forced and certainly being forcibly abducted was a part of that. We do have cases, though, don't we, that say that the omission of every detail doesn't necessarily mean that the added details are false, right? I believe the Court does have cases like that. At the same time, the question here, and I have to say I think that the Court also has cases that say that significant omissions can be considered. And really, the question under the substantial evidence standard is, is there evidence to compel a contrary conclusion in that reach by the agency? And there's nothing in the record to show that the agency was wrong to say that she omitted this at certain significant points in the record. So I think that there's evidence to support the agency's conclusion, and that's what matters. Regarding the – I believe there was a question about whether or not the Petitioner knew that the fine receipts were fraudulent. And there's a case, Yemeni Baria, that I believe is mentioned at some point. I've distinguished that case here. At page 337 of the record, the Petitioner herself testified that she received at least one of these fine receipts herself in China. That's an indication that she knew what this document was when she presented it to the Immigration Court. So I would say that there's evidence that she knew it was fraudulent. How does that show that she knew that it was fraudulent? Obviously, she received it or she wouldn't have it to present. So why does her saying she received it show that she knew it was fraudulent? When I say received it, I mean she received it in China. She received it during the course of the events to which she's testifying to. Whereas in Yemeni Baria, the alien only received the document here in the United States and had no knowledge of how it had been obtained. So in this case, we have every reason to believe that the alien would have known the source of that document. She claimed it came in the course of these, the alleged forced abortion, but what the evidence shows is that it was fabricated. And I think it's a reasonable inference to conclude that she knew that and a reasonable conclusion that she was fabricating her entire story, or at least that she was not credible. If the Court disagrees with the government's view on the adverse credibility point, we would ask the Court to not deem the alien credible. And I would cite to the Sotomayor decision that I provided to the Court today. Mr. Manning, you are out of time. Thank you. I'm sorry, Your Honor. Thank you very much. The government would ask that the petition be denied. Thank you. If you argue it, we'll give you another 30 seconds to equalize the time. Very quickly, I've tried to work with district councils in trying to get a mediation in this case, and INS has not wanted to do that. Also, the I-485 was not denied. They refused to accept it because of the deportation order. And as far as the documents, there's no proof that Ms. Wein knew that they were fraudulent. And, again, many fraudulent documents came out of China, so the district council didn't show that she actually knew that they were fraudulent. And I think that's very important. I would submit that her testimony was credible, that she did undergo a forced abortion, that she has suffered dearly, and under the Victims Trafficking Act, she is entitled to relief. And I ask that this Court fashion a relief that is appropriate for her. Thank you very much. Okay. Thank you, Ms. Schaffer. And thank you, counsel, both of you, for your argument. And the matter, as argued, will be submitted.
judges: Rymer, Graber, Bea